KNIGHT & RYAN PLLC
Robert A. Ryan #12084
robert@knightryan.com
Scott A. Knight #9083
scott@knightryan.com
KNIGHT & RYAN
8880 W. Sunset Rd., Suite 130
Las Vegas, Nevada 89148
Telephone: (702) 462-6083

MUNGER TOLLES & OLSON LLP
Bethany W. Kristovich (CA State Bar No. 241891)
bethany.kristovich@mto.com
*pro hac vice* forthcoming
Daniel B. Levin (CA State Bar No. 226044)
daniel.levin@mto.com
*pro hac vice* forthcoming
Juliana M. Yee (CA State Bar No. 304564)
juliana.yee@mto.com
Jessica O. Laird (CA State Bar No. 331713)
jessica.laird@mto.com
*pro hac vice* forthcoming
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100

*Attorneys for Movant ByHeart, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: Subpoena Issued to:<br><br>Dairy Framers of America<br><br>Related to:<br><br>United States District Court for the Southern District of Texas<br><br>Anit Joseph and Luke Pooley, Individually and as next friend of K.P., a minor,<br><br>vs.<br><br>ByHeart, Inc., a Delaware corporation, and Target Corporation, a Minnesota corporation,<br><br>Case No.: 3:25-cv-00391 | Misc. Case No. 2:26-ms-00002<br><br>**BYHEART'S EMERGENCY MOTION TO COMPEL PRODUCTION OF DRY MILK POWDER SAMPLES FOR TESTING AND DOCUMENTS FROM NON-PARTY DAIRY FARMERS OF AMERICA** |

# **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................ 1

II.    RELEVANT BACKGROUND .......................................... 3

    A.    ByHeart Promptly Initiated a Recall and Root Cause Investigation After Learning of the Infant Botulism Outbreak ............................ 3

    B.    ByHeart Has Repeatedly Requested Key Dry Milk Powder Samples from DFA ........................................... 4

    C.    Testing Reveals *C. bot* in DFA-Processed Dry Milk Powder Samples ........ 12

    D.    DFA Has Offered a Host of Excuses for Failing to Comply with ByHeart's Requests .............................. 13

III.   ARGUMENT ................................................................... 16

    A.    The Court Should Compel DFA to Comply with the Subpoena .................. 16

        1.    ByHeart Seeks a Narrow Set of Relevant Discovery ...................... 17

        2.    None of DFA's Objections Is Well-Taken ........................................ 17

IV.   CONCLUSION ............................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Abbie v. Shasta Cnty.*,
No. 2:20-CV-01995-KJM-DMC, 2023 WL 4274135 (E.D. Cal. June 29, 2023) ......... 20

*Evenstar Master Fund SPC v. Cao*,
No. 2:20-CV-02333-KJD-BNW, 2022 WL 476095 (D. Nev. Feb. 15, 2022) .............. 16

*Hernandez v. Cajun Operating Co.*,
No. 1:20-CV-00043, 2021 WL 5154782 (S.D. Tex. Aug. 30, 2021) ........................... 18

*In re Medport LA, LLC*,
No. 2:20-cv-00552-JAD-BNW, 2020 WL 3621343 (D. Nev. July 1, 2020)................ 16

*MPH Techs. Oy v. Apple Inc.*,
No. 3:24-CV-00271-ART-CLB, 2024 WL 3792712 (D. Nev. Aug. 13, 2024) ........... 16

*Painters Joint Comm. v. Emp. Painters Tr. Health & Welfare Fund*,
No. 2:10-CV-01385-JCM-PAL, 2011 WL 4573349 (D. Nev. Sept. 29, 2011)....... 16, 18

*Photography By Frank Diaz, LLC v. Friends of David Schweikert*,
No. CV-22-01170-PHX-JAT, 2023 WL 3078664 (D. Ariz. Apr. 25, 2023) ................................................................................................................... 19

*PlayUp, Inc. v. Mintas*,
No. 2:21-cv-02129-GMN-NJK, 2024 WL 472639 (D. Nev. Feb. 6, 2024) ........... 18, 19

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................ 18

*Welk Biology Co. v. Hakumo LLC*,
No. 2:24-CV-01613-APG-NJK, 2025 WL 3287591 (D. Nev. Oct. 21, 2025) ........ 17, 18

**CASES - OTHER**

*Joseph v. ByHeart, Inc.*,
Case No. 3:25-cv-00391 (filed on Dec. 1, 2025) ............................................................ 1

**FEDERAL RULES**

Fed. R. Civ. P. 26................................................................................................ 15, 16

Fed. R. Civ. P. 45.......................................................................................... 1, 15, 16

**RULES - OTHER**

Local Rule 7-4 ......................................................................................... 1, 3

**OTHER AUTHORITIES**

Dairy Farmers of America, *Who We Are, available at*:
    https://careers.dfamilk.com/who-we-are (last accessed Jan. 27, 2026) ........................... 2

JoNel Aleccia, *Two companies made dried milk powder linked to botulism in
    ByHeart baby formula*, ASSOCIATED PRESS (Jan. 28, 2026),
    https://apnews.com/article/byheart-west-milk-dairy-farmers-of-america-
    cdbc131b7e1c144a2635f369739d62f2 ............................................................. 2

Defendant ByHeart, Inc. moves the Court for relief pursuant to Local Rule 7-4 and Federal Rule of Civil Procedure 45(d)(2)(B)(i) compelling Dairy Farmers of America ("DFA") to produce samples of dry milk powder for testing, as well as two targeted requests for documents, sought by ByHeart's December 16, 2025, subpoena.

## I.  <u>INTRODUCTION</u>

This Motion seeks production of samples of dry milk powder located at DFA's Fallon, Nevada plant, as well as two narrow categories of documents, all of which are critical to ByHeart and the FDA's ongoing investigation into the root cause of a 2025 outbreak of infant botulism and ensuing litigation.  *See Joseph v. ByHeart, Inc.*, Case No. 3:25-cv-00391 (filed on Dec. 1, 2025).

ByHeart manufactures organic whole milk baby formula.  One ingredient in that formula is dry milk powder.  DFA creates that powder by taking whole milk from Organic West and spray-drying it into a powder.  In November 2025, the FDA notified ByHeart of an outbreak of infant botulism among infants who reportedly consumed ByHeart formula. ByHeart immediately issued a voluntary recall of its affected infant formula products and, within three days, broadened the recall to include all ByHeart products.  The FDA has identified 51 cases of infant botulism in infants who reportedly consumed ByHeart formula.

ByHeart and the FDA immediately commenced an investigation into the root cause of the outbreak.  During that investigation, two samples of dry milk powder processed by DFA tested positive for *Clostridium botulinum (C. bot)*, a bacterium that causes infant botulism—one sample collected at ByHeart and the other collected from DFA by the FDA. Both of the *C. bot* strains identified in these samples are a genetic match to *C. bot* found in ByHeart formula, and one of the strains identified is a genetic match to at least one infant who contracted botulism.

While the contaminated samples genetically matched bacteria found in finished ByHeart formula and in samples from at least one sick infant, the precise point of contamination has not yet been determined.  ByHeart has sought additional samples from

DFA to assess the source and breadth of the contamination observed at DFA.  Organic West, the owner of the samples, has no objection to ByHeart obtaining the samples, provided the parties agree on a testing protocol and share the results.  Despite the critical public health need and permission from the owner of the samples, DFA continues to resist providing additional samples for testing and critical documents in response to this subpoena.

DFA has refused to either acknowledge the veracity of the FDA's test results or permit additional testing.  DFA has taken the position that additional testing "does not benefit anyone" and has argued that any further testing should wait until additional results emerge from the FDA.  The FDA is aware of DFA's lack of cooperation and ByHeart's intent to seek the Court's intervention.  Its recent findings in a sample collected from DFA underscore the urgent need to conduct additional testing to assess the scope of potential *C. bot* contamination in DFA-processed dry milk powder.  While current testing reveals that dry milk powder is likely the source of the botulism found in ByHeart formula, it provides no insight into how widespread the contamination is, how long it persisted, or where critical supply chain controls may have failed—essential questions for litigating this dispute and protecting public health.  DFA claims to be the "largest" dairy company in the U.S. and the "3rd largest" in the world.[1]  Nevertheless, DFA is not performing its own *C. bot* testing on dry milk powder.  It has not issued a recall of any products and maintains that "[t]he milk was processed into powder that met all required tests."[2]

The harm threatened by DFA's course of conduct is compounded by its attempts to delay resolution of this dispute.  ByHeart first reached out to DFA to request the samples on December 2, 2025.  After failing to secure agreement to produce samples for testing,

---

[1] Dairy Farmers of America, *Who We Are*, *available at*: https://careers.dfamilk.com/who-we-are (last accessed Jan. 27, 2026).

[2] JoNel Aleccia, *Two companies made dried milk powder linked to botulism in ByHeart baby formula*, ASSOCIATED PRESS (Jan. 28, 2026), https://apnews.com/article/byheart-west-milk-dairy-farmers-of-america-cdbc131b7e1c144a2635f369739d62f2.

ByHeart served this subpoena on December 16 with a compliance date of December 30. ByHeart has met and conferred with DFA no fewer than eight times in the last five weeks—repeatedly narrowing its requests with no meaningful progress. For the past month, DFA has engaged in obfuscation and delay.

DFA should be compelled to produce these key samples and documents critical to a fuller understanding of the root cause of the *C. bot* contamination and infant food safety. ByHeart further requests that the Court address this Motion on a priority basis and based on an expedited briefing schedule, consistent with Local Rule 7-4.

## II. RELEVANT BACKGROUND

### A. ByHeart Promptly Initiated a Recall and Root Cause Investigation After Learning of the Infant Botulism Outbreak

ByHeart was founded in 2016 with the goal of developing an infant formula product that is free from various industrial additives and produced using ByHeart's own manufacturing process. ByHeart is driven by its commitment to families and the paramount importance of safety in infant nutrition.

This commitment is the reason why, in early November 2025, ByHeart took swift, proactive steps after the FDA notified the company of an outbreak of *C. bot* infections (also known as infant botulism) among infants, some of whom had reportedly consumed ByHeart infant formula. ByHeart issued an immediate and voluntary recall of several lots and then expanded the recall to all its infant formula products. Declaration of Niall Mullane [Mullane Decl.] ¶ 6.

ByHeart simultaneously initiated a root cause investigation of the botulism outbreak, engaging world-class food safety and *C. bot* experts to tour ByHeart's facilities, review data, and help identify possible entry points. *Id.* ¶ 8. It also engaged IEH Laboratories & Consulting Group, an independent laboratory and respected leader in food safety testing, to test for *C. bot*. IEH is accredited by multiple international standards-setting organizations, including the International Organization for Standardization ("ISO"). *Id.*

As ByHeart published on its website in December 2025, IEH identified positive test results for *C. bot* in six of 36 samples of finished ByHeart product. *Id.* ¶ 15. Organic West dry milk powder—all of which is processed by DFA—is in every batch of ByHeart formula and was in each of the positive samples of finished product. *Id.* ¶¶ 5, 17. Organic West is ByHeart's sole supplier of dry milk powder. *Id.* ¶ 5.

Since the recall, ByHeart has been sued by 10 plaintiffs who allege their infants contracted infant botulism after consuming the formula. This *Joseph* suit involves one such family. In their suit, Plaintiffs allege that ByHeart's infant formula was contaminated with *Clostridium botulinum* in breach of the company's alleged duty to "use ingredients, . . . and other constituent materials that were reasonably safe, wholesome, free of defects, . . . clean, free from adulteration, and safe for human consumption." Declaration of Jessica Laird [Laird Decl.] ¶ 2, Ex. A, at ¶ 59.

B.     **ByHeart Has Repeatedly Requested Key Dry Milk Powder Samples from DFA**

As part of the root cause investigation, ByHeart engaged in an extensive review of its manufacturing facilities designed to evaluate whether the *C. bot* identified in early testing was introduced during the manufacturing or packaging of its formula. Mullane Decl. ¶ 8. ByHeart immediately began testing the raw ingredients that it had on hand from various suppliers, including Organic West, regardless of whether those ingredients had been used in the finished product that tested positive. ByHeart also sought to obtain samples of ingredient lots that had been used in the formula that tested positive. *Id.* ¶¶ 14-18. Suppliers generally hold portions of each of their ingredient lots, also known as "retains," for exactly these purposes. *Id.* ¶ 14.

ByHeart reached out to Organic West on November 14, 2025 to request samples of a dry milk powder lot that went into one of the batches of formula that tested positive.[3]

---

[3] The requested lot, lot 2127243611, was identified as high priority because it was used in one of the finished ByHeart formula lots that tested positive for *C. bot.* Mullane Decl. ¶17.

*See id.* ¶ 17; Laird Decl. ¶ 4, Ex. C, at 28-29 [Beachy 11/14/25 1:25 PM email].  Organic West responded that that the samples were not in its possession but were at DFA's facilities, where Organic West's whole milk is "spray dried" to turn it into powder.  Laird Decl. ¶ 4.  Despite not owning the product, DFA refused Organic West's request to provide the samples to ByHeart.  *Id.* ¶ 4, Ex. C, at 25 [Nunes 11/21/25 4:23 PM email].

After Organic West's outreach failed, ByHeart reached out to DFA on December 2, 2025 to request samples of the highest priority lot for testing.  *Id.* ¶ 6, Ex. E, at 36-37 [Laird 12/2/25 12:09 PM email].  ByHeart sent a follow-up letter on December 5.  Laird Decl. ¶ 7, Ex. F [Levin 12/5/25 letter].  DFA responded, acknowledging "the need to conduct a root cause investigation in this situation" and asserting that it "take[s] seriously our obligation to produce safe food for consumers and work to be cooperative with FDA and industry partners when outbreaks occur."  *Id.* ¶ 6, Ex. E, at 36 [Lombard 12/5/25 3:56 PM email], ¶ 8.  But it "respectfully decline[d ByHeart's] request to send retained samples to IEH for testing," describing such testing as "not necessary."  *Id.*  It further noted that the FDA had obtained samples of lot 2127243611 for testing.  *Id.*

On December 16, 2025, ByHeart served a subpoena.  *Id.* ¶ 12, Ex. H.  The subpoena sought several targeted categories of information, including: 1 KG samples of ByHeart ingredient lot retains, documents relating to botulism, and DFA's policies and protocols applicable to "ByHeart Ingredients" (defined to include ByHeart-destined dry milk powder), such as those relating to sanitation, ingredient traceability, and botulism testing.  *Id.* at 51-52.

The Parties first met and conferred with DFA and its outside counsel on December 18.  *See Id.* ¶ 14, Ex. J [Laird 12/20/25 12:22 AM email].  DFA raised a litany of objections to providing the samples, ranging from vague concerns regarding the FDA's investigation to a claim that DFA needed Organic West's consent to produce any samples for testing (notwithstanding that Organic West had been the first to request the samples from DFA).  *Id.* ¶ 15.  On December 23, 2025, counsel for Organic West confirmed for DFA that Organic West consented to DFA releasing any samples for testing, provided that

DFA and ByHeart mutually agreed on a lab and methodology and that all test results are immediately shared with Organic West. *Id.* ¶ 18, Ex. L, at 64-65 [Tener 12/23/25 9:59 AM email].

The Parties met and conferred for the second time on December 26, 2025. *Id.* ¶ 19. At DFA's request and in light of the holiday week, ByHeart agreed to a short extension of the subpoena response deadline on the condition that DFA would materially comply with the subpoena. *Id.* ¶ 20, Ex. M, at 67-68 [Laird 12/27/25 5:06 PM email].

On December 30, 2025, DFA served responses and objections to the subpoena. *Id.* ¶ 22, Ex. N. DFA responded to each request with boilerplate objections, refusing to state whether it would agree to produce the samples or documents requested. *Id.*

The requests at issue, along with DFA's responses, are excerpted below:

**ByHeart Request (1):** One kilogram Sample from each lot of ByHeart Ingredients[4] that you received, produced, manufactured, processed, distributed, or stored from August 1, 2021 to present, including but not limited to a Sample from lot number 2127243611.

**DFA Response:** In addition to its General Objections, each of which is incorporated herein by reference, DFA objects to this Request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence to the extent it seeks samples of Organic West Ingredient sold, supplied or intended for entities other than ByHeart, which have no relevance whatsoever to the underlying Litigation, seeks samples from "each lot" of all ByHeart Ingredients from August 1, 2021 to present, is not limited to the specific lot(s) of the specific ByHeart Ingredients at issue in the Litigation, seeks lots that are expired and beyond the shelf life, and to the extent the Request seeks samples that predate ByHeart's manufacture of formula and before the plaintiff consumed any product potentially containing DFA product. DFA further objects to this Request as overly broad and unduly burdensome given that DFA does not

---

[4] ByHeart Ingredients is defined in the subpoena as "any material or ingredient sold, supplied or intended, designated or allocated for supply to ByHeart, including but not limited to whole milk dried powder for ByHeart Whole Nutrition Infant Formula and Anywhere Pack products."

know which lots it manufactured for Organic West were sold to the issuing party and given that Plaintiff did not consume product from all lots manufactured with product from Organic West that was manufactured by DFA. Additionally, DFA objects to the extent it seeks a "one kilogram sample" from each lot, on the basis the requested amount may be excessive and is unduly burdensome and duplicative, particularly given that one kilogram samples are sought from lots that were not used in the product consumed by Plaintiff and that FDA has pending test results and already collected a sample. DFA further objects to this Request to the extent it seeks information that is in the possession, custody or control of the parties to the Litigation or equally available from another source as from DFA, a non-party to the Litigation, including the issuing party, who should have retains from the product at issue in the litigation. DFA also objects to this Request to the extent it seeks materials that are not in the possession, custody or control of DFA. DFA further objects to the extent that the issuing party is trying to obtain discovery from DFA for an ongoing investigation that it has been conducting for some time, which may exceed the scope of the subject matter of the litigation, particularly given that the Requests seek information relating to lots not used in product consumed by Plaintiff. DFA further objects to this Request to the extent it seeks material protected by the attorney-client privilege, work-product doctrine, common interest or any other privilege or protection provided by law. DFA further objects to this Request to the extent it seeks protected trade secrets or other confidential, proprietary or sensitive commercial information, including any internal DFA documents that DFA considers confidential, as well as any information subject to contractual confidentiality obligations to third parties. DFA will not produce documents containing such information unless and until an appropriate protective order is entered in the action.

Notwithstanding and without waiving its General and Specific Objections, DFA remains willing to meet and confer with you regarding appropriate scope and timing for any production in response to this Request, if any.

**ByHeart Request (4):** Any and all non-privileged Documents and Communications relating to Botulism since March 1, 2020, including without limitation Documents relating to testing for Botulism performed on ByHeart Ingredients or Organic West Ingredients.

**DFA Response:** In addition to its General Objections, each of which is incorporated herein by reference, DFA objects to this Request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence, particularly to the extent it seeks "any and all" non-privileged documents relating to "Botulism" for a five-and-a-half-year timeframe, is not limited to the specific lot(s) of the specific ByHeart Ingredients or Organic West Ingredients at issue in the Litigation, and to the extent it seeks documents that predate ByHeart's manufacture of baby formula. DFA further objects to the terms "Botulism" and "testing for Botulism" as vague and ambiguous as defined in the Subpoena; as noted above, DFA will interpret this request as seeking information relating to botulinum toxins. DFA further objects to this Request to the extent it seeks information that is in the possession, custody or control of the parties to the Litigation or equally available from another source as from DFA, a non-party to the Litigation. DFA further objects to the extent that the issuing party is trying to obtain discovery from DFA for an ongoing investigation that it has been conducting for some time, which may exceed the scope of the subject matter of the Litigation, particularly given that the Requests seek information relating to lots not used in product consumed by Plaintiff. DFA further objects to this Request to the extent it seeks documents that are not in the possession, custody or control of DFA. DFA further objects to this Request to the extent it seeks protected trade secrets or other confidential, proprietary or sensitive commercial information, including any internal DFA documents that DFA considers confidential, as well as any information subject to contractual confidentiality obligations to Organic West or other third parties. DFA will not produce documents containing such information unless and until an appropriate protective order is entered in the action.

Notwithstanding and without waiving its General and Specific Objections, DFA remains willing to meet and confer with you regarding appropriate scope and timing for any production in response to this Request, if any.

**ByHeart Response (7):** Your policies, procedures, and protocols in effect from August 1, 2021 to present applicable to ByHeart Ingredients, including without limitation policies relating to sanitation, ingredient traceability, hazard analysis and critical control points, microbiological testing, and Botulism testing.

**DFA Response:** In addition to its General Objections, each of which is incorporated herein by reference, DFA objects to this Request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence, particularly to the extent it seeks all policies, procedures and protocols applicable to any ByHeart Ingredient for a four-year timeframe without limitation by subject matter, to the extent it seeks information regarding ByHeart Ingredients or lots other than those at issue in the Litigation, and to the extent it seeks documents that predate ByHeart's manufacture of baby formula. DFA further objects to the extent that the issuing party is trying to obtain discovery from DFA for an ongoing investigation that it has been conducting for some time, which may exceed the scope of the subject matter of the Litigation, particularly given that the Requests seek information relating to lots not used in product consumed by Plaintiff. DFA further objects to this Request to the extent it seeks material protected by the attorney-client privilege, work-product doctrine, common interest or any other privilege or protection provided by law. DFA further objects to this Request to the extent it seeks protected trade secrets or other confidential, proprietary or sensitive commercial information, including any internal DFA documents that DFA considers confidential, as well as any information subject to contractual confidentiality obligations to third parties. DFA will not produce documents containing such information unless and until an appropriate protective order is entered in the action.

Notwithstanding and without waiving its General and Specific Objections, DFA remains willing to meet and confer with you regarding appropriate scope and timing for any production in response to this Request, if any.

On January 5, 2026, ByHeart sent a detailed letter outlining the deficiencies in DFA's responses, reiterating the relevance and importance of obtaining the samples promptly, and requested a third meet and confer to attempt to resolve the Parties' dispute. *Id.* ¶ 23, Ex. O [Kristovich 1/5/26 letter].

On January 9, more than a month after ByHeart first contacted DFA, the Parties again met and conferred. *Id.* ¶ 25. When pressed to provide its position on ByHeart's sampling request, DFA stated that it would not produce the requested lot samples based on its objections that the samples were not relevant and were burdensome to produce in light

9

of the FDA's ongoing investigation. *Id.* ¶ 26. DFA also objected to ByHeart's selection of IEH to test the samples, citing as its sole objection that IEH does not have experience testing DFA's product. *Id.* Despite this issue having been discussed on prior calls, DFA could neither articulate a specific basis for its objection to IEH nor identify an alternative lab capable of conducting ISO 17919 PCR testing. *Id.* It also conceded that it had well over 1 KG of retains left from lot number 2127243611, such that after producing a 1 KG sample, it would still retain roughly 800 grams of material from the priority lot. *Id.* ¶ 25.

As for ByHeart's document requests, DFA claimed that the request for documents related to "botulism" was burdensome, but it was unprepared to state whether there were any other documents responsive to ByHeart's request for documents relating to botulism, the quantity of such documents, or the basis for any burden. *Id.* ¶ 28. Nor was it prepared to state whether DFA was willing to produce policies applicable to ByHeart Ingredients, stating that counsel needed to consult with her client regarding DFA's willingness to produce the policies. *Id.*

In an effort to compromise, ByHeart agreed to withdraw requests 2, 5, and 6, and narrow its remaining requests as follows:

| Request Number | Original Request | Narrowed Request |
|---|---|---|
| 1 | One kilogram Sample from each lot of ByHeart Ingredients that you received, produced, manufactured, processed, distributed, or stored from August 1, 2021 to present, including but not limited to a Sample from lot number 2127243611. | One kilogram Sample from each lot of ByHeart Ingredients that DFA received, produced, manufactured, processed, distributed or stored from January 1, 2023 to present, including but not limited to a Sample from lot number 2127243611. |
| 2 | [ByHeart voluntarily agreed to withdraw in an effort to compromise] | [ByHeart voluntarily agreed to withdraw in an effort to compromise] |
| 3 | Any and all Documents and Communications relating to ByHeart, including without limitation Documents relating to ByHeart Ingredient and ByHeart lot number 2127243611. | Documents sufficient to show what retains of each lot of |

| | | |
|---|---|---|
| | | ByHeart Ingredients DFA has in its possession, custody or control.[5] |
| 4 | Any and all non-privileged Documents and Communications relating to Botulism since March 1, 2020, including without limitation Documents relating to testing for Botulism performed on ByHeart Ingredients or Organic West Ingredients. | Any and all non-privileged Documents and Communications relating to Botulism since January 1, 2023, including but not limited to Documents relating to testing for Botulism performed on ByHeart Ingredients. |
| 5 | [ByHeart voluntarily agreed to withdraw in an effort to compromise] | [ByHeart voluntarily agreed to withdraw in an effort to compromise] |
| 6 | [ByHeart voluntarily agreed to withdraw in an effort to compromise] | [ByHeart voluntarily agreed to withdraw in an effort to compromise] |
| 7 | Your policies, procedures, and protocols in effect from August 1, 2021 to present applicable to ByHeart Ingredients, including without limitation policies relating to sanitation, ingredient traceability, hazard analysis and critical control points, microbiological testing, and Botulism testing. | DFA's policies, procedures, and protocols in effect from January 1, 2023 to present applicable to ByHeart Ingredients, including without limitation policies relating to sanitation, ingredient traceability, hazard analysis and critical control points, microbiological testing, and Botulism testing. |

*See id.* ¶ 27.

On January 13, 2026, during the Parties' fifth meeting, DFA offered to produce certain limited documents in response to several of ByHeart's document requests but remained unprepared to state whether DFA was willing to provide other documents responsive to the requests, citing various relevancy and burden objections. *Id.* ¶ 29. DFA emailed ByHeart the next day to provide volume information about additional ByHeart lot retains in its possession but failed *again* to state whether it was willing to provide documents responsive to ByHeart's narrowed requests. *See id.* ¶ 30, Ex. Q, at 85-90 [Laird 1/15/26 3:50 PM email].

---

[5] This request is no longer in dispute.

**C.  Testing Reveals _C. bot_ in DFA-Processed Dry Milk Powder Samples**

Around this time, ByHeart's investigation detected _C. bot_ spores in samples of Organic West dry milk powder processed at DFA's facility.  Mullane Decl. ¶ 18.  On January 16, 2026, ByHeart informed DFA that samples of dry milk powder processed in DFA's facilities and delivered to ByHeart—but not included in finished ByHeart formula at the time of the recall—tested positive for _C. bot_ in recent days.  Laird Decl. ¶ 32.  ByHeart inquired whether DFA would comply with the pending sample requests in light of the recent test results, and DFA refused.  _See id._

Following that call, IEH performed whole genome sequencing—the FDA-endorsed method by which _C. bot_ strains in contaminated foods can be matched to strains found in individual patients—on the positive _C. bot_ sample of DFA-processed dry milk powder.  The testing revealed that the sample genetically matched one of the samples that had been collected from an affected infant, as well as a sample of ByHeart infant formula that tested positive for _C. bot_.  Mullane Decl. ¶ 18.  On January 20, 2026, ByHeart informed DFA that whole genome sequencing confirmed that the positive sample matched a sample of ByHeart formula and a sample provided by an infant linked to the infant botulism outbreak.  Laird Decl. ¶ 33.

Three days later, the FDA announced publicly that two samples of DFA-processed dry milk powder tested positive for _C. bot_:

1.  The sample of DFA-processed dry milk powder that ByHeart collected from a lot on hand and tested at IEH (the "IEH Result").  Mullane Decl. ¶19, Ex. A [1/23/26 FDA Update].  (This is the result that ByHeart first shared with DFA on January 16, 2026.)  ByHeart had shared this result with the FDA.  Laird Decl. ¶ 33.  On January 23, the FDA reported that the IEH Result is a genetic match to _C. bot_ identified in one of the 51 infants identified by the FDA as being part of the infant botulism outbreak as well as _C. bot_ identified in a can of ByHeart infant formula.  Mullane Decl. ¶19, Ex. A.

2.  A sample of DFA-processed dry milk powder that the FDA collected from DFA's Nevada facility and tested at New York Wadsworth Laboratory (the "Wadsworth

12

Result").[6]  *Id.*  The FDA has reported that the Wadsworth Result is a genetic match to *C. bot* detected in a different finished product sample of ByHeart infant formula.  *Id.*

In a final meeting with ByHeart on January 26, 2026, DFA once again took the position that, despite the positive test result linking the DFA-processed dry milk powder to the ongoing outbreak, it was not prepared to agree to provide samples of any materials.  Laird Decl. ¶ 34.  It maintained that discussion of sample production should wait until it received additional results of testing performed by the FDA.  DFA confirmed that it had not sent out any samples of dry milk powder for testing.  *Id.*  DFA raised yet additional questions regarding ByHeart's testing, including whether ByHeart had tested "vitamins and minerals" in the formula.  *Id.*  When asked if DFA planned to dispute the validity of the FDA's *C. bot* and whole genome sequencing test results, DFA was not prepared to state its position.  *Id.*

### D.     DFA Has Offered a Host of Excuses for Failing to Comply with ByHeart's Requests

Over the course of 8 weeks, DFA has offered a host of excuses to both Organic West (the product owner) and ByHeart (the product customer) as to why it cannot produce the requested samples and documents.

*First*, since ByHeart's initial outreach, DFA has resisted ByHeart's requests for samples claiming they are "duplicative" of the FDA's investigation.  This is untrue as a factual matter.  When it comes to *C. bot* detection, the more testing, the better.  Additional testing yields more information to support ByHeart's root cause investigation and protect public health.  A negative test of one sample does not preclude the possibility of finding *C. bot* in a different sample taken from the same ingredient lot.  *See* Mullane ¶ 9.  Because *C.*

---

[6] The FDA's January 23, 2026 report does not disclose the identity of the "processor for a supplier to ByHeart" from which it collected the Wadsworth Result sample.  *See* Mullane Decl. ¶ 19, Ex. A [1/23/26 FDA Update].  DFA has confirmed in meet-and-confer sessions that the FDA has identified a positive sample of product collected from its Nevada facility.  Laird Decl. ¶ 34.

*bot* spores can be distributed unevenly within a single lot of the same product, testing multiple samples is critical to accurately determining the source of any *C. bot* outbreak. *Id.* ¶ 9-10. And, having received a positive test result from one lot of DFA-processed dry milk powder, it is critical to test samples from *other* lots to determine whether *C. bot* may be present in those lots.

*Second*, at various points, DFA has also implied that its refusal to provide samples was a decision made in consultation with the FDA and subject to the FDA's instruction. This is also untrue. In discussions, the FDA confirmed to ByHeart there is no FDA-imposed restriction preventing ByHeart's testing of the requested materials. *See* Laird Decl. ¶ 14.

*Third*, DFA has refused to provide the requested samples on the ground that the amount of sample retains requested—1 KG—"may be excessive." *Id.* ¶ 23, Ex. O, at 80. That, too, has been proven highly exaggerated. DFA has confirmed that it possesses well in excess of 1 KG (1000 grams) samples of each of four Organic West lots ByHeart identified as being in DFA's possession and subject to the subpoena. *Id.* ¶¶ 25, 30. DFA has not identified any other lot that would be depleted following production of ByHeart's requested 1 KG sample.

*Fourth*, counsel for DFA has objected to using IEH to conduct the testing. When pressed for the grounds for objection, DFA has offered only its preference to use a lab familiar with its products. It has not identified any problem with IEH or proposed an alternative lab. *Id.* ¶ 26. To ByHeart's knowledge, IEH is the only lab in the United States that currently conducts testing for botulism using not only the FDA's Bacteriological Analytical Manual ("BAM") method, but also the ISO Polymerase Chain Reaction ("ISO PCR") 17919 methodology. Mullane Decl. ¶ 12. ISO PCR is a rapid screening method that focuses on detecting genetic markers and does not require extended incubation of a viable organism for initial testing—it can detect trace levels of bacterial DNA that cell-based methods can miss. *Id.* ¶ 11. DFA has confirmed that the labs it uses for product

testing cannot perform the ISO PCR method, and it has not identified any other alternative lab that can do so.  Laird Decl. ¶ 34.

*Fifth*, regarding the document requests, DFA has broadly objected that documents relating to botulism and protocols regarding ByHeart ingredients are not relevant to the underlying litigation or reasonably calculated to lead to admissible evidence and are unduly burdensome to produce because DFA is a non-party.  *Id.* ¶ 22, Ex. N, at 74-77.  Of course, documents relating to botulism—such as documents relating to potential reports of botulism in DFA products, testing for botulism, or any regulatory communications relating to botulism—would be directly relevant to the case and root cause analysis.  Likewise, policies and protocols regarding the testing, quality control, and deviation investigations of ByHeart ingredients like the Organic West dry milk powder are relevant to evaluating whether the dry milk powder that went into ByHeart formula was manufactured in accordance with specifications.  Despite meeting and conferring for nearly two months, DFA has never provided search term hit counts, custodian information, or other factual bases for its assertion of "undue burden."  When ByHeart asked in one of its final meet and confers in January whether DFA had identified custodians with potentially responsive documents or run hit counts to evaluate the potential burden, DFA confirmed they had not. *Id.* ¶ 28.  In fact, DFA could not state whether or not there were any documents responsive to ByHeart's requests besides a set of Sulfite Reducing Clostridia reports—an allergen test that is not sensitive or specific enough to detect *C. bot*, Mullane Decl. ¶ 13 —that it agreed to produce, Laird Decl. ¶ 28.

Finally, DFA has suggested that it would not comply with ByHeart's requests for samples or documents if Plaintiffs in the underlying litigation were opposed to the instant Motion or the testing.  Laird Dec. ¶ 28.  Defense counsel has met and conferred with Plaintiffs' counsel regarding the subpoena and Motion to Compel.  *Id.* ¶ 31.  Plaintiffs do not object to this Motion, nor do they object to IEH testing the samples for *C. bot.  Id.*

### III.   **ARGUMENT**

Federal Rule of Civil Procedure 45 provides that a party may subpoena a non-party to produce documents, electronically stored information, and tangible things, including "sampling of the materials." Fed. R. Civ. P. 45(a)(1)(A)(iii), (a)(1)(D). The scope of discovery under Rule 45 for a non-party is the "same" as the scope of discovery allowed for parties under Rule 26. *In re Medport LA, LLC*, No. 2:20-cv-00552-JAD-BNW, 2020 WL 3621343, at *3 (D. Nev. July 1, 2020). A party may seek from both a party and a non-party "discovery concerning any nonprivileged matter that is relevant to any party's claim or defense." *Id.* (citing Fed. R. Civ. P. 26(b)(1)).

If a non-party resists providing subpoenaed discovery, a party may move for an order compelling production of the requested discovery. *See* Fed. R. Civ. P. 45(d)(2)(B)(i); *Evenstar Master Fund SPC v. Cao*, No. 2:20-CV-02333-KJD-BNW, 2022 WL 476095, at *2 (D. Nev. Feb. 15, 2022). The party "opposing a motion to compel bears the burden of establishing why the discovery should not be had." *Evenstar Master Fund SPC*, 2022 WL 47095, at *2.

#### A.   **The Court Should Compel DFA to Comply with the Subpoena**

Where discovery sought is "relevant" and the non-party "fail[s] to demonstrate that compliance would be an undue burden," courts compel compliance. *See, e.g.*, *MPH Techs. Oy v. Apple Inc.*, No. 3:24-CV-00271-ART-CLB, 2024 WL 3792712, at *5 (D. Nev. Aug. 13, 2024). These targeted requests seek highly relevant discovery, and DFA cannot prove otherwise. *Painters Joint Comm. v. Emp. Painters Tr. Health & Welfare Fund*, No. 2:10-CV-01385-JCM-PAL, 2011 WL 4573349, at *5 (D. Nev. Sept. 29, 2011). ByHeart may obtain discovery from DFA on any nonprivileged matter "that is relevant to any party's claim or defense." *In re Medport LA*, 2020 WL 3621343, at *3 (quoting Fed. R. Civ. P. 26(b)(1)). Relevance is "defined broadly," and "[m]aterial may be discoverable even if not admissible at trial." *Welk Biology Co. v. Hakumo LLC*, No. 2:24-CV-01613-APG-NJK, 2025 WL 3287591, at *1 & n.3 (D. Nev. Oct. 21, 2025).

### 1. ByHeart Seeks a Narrow Set of Relevant Discovery

The positive IEH and Wadsworth Results identified to date point to the possibility that the DFA-processed dry milk powder introduced *C. bot* into certain cans of ByHeart infant formula. ByHeart seeks samples and documents to further evaluate DFA-processed dry milk powder as a potential root cause. The materials sought by ByHeart's subpoena are highly probative of liability issues in this case, and they are essential for developing and litigating defenses under Texas's proportionate responsibility framework. Identification of *C. bot* in dry milk powder lots that went into finished formula batches—even if different from the ones Plaintiffs' infant consumed—bears on the strength of the causal link Plaintiffs will seek to establish between their infant's alleged botulism and ByHeart formula, and the identity of suppliers in the chain potentially responsible for the introduction of *C. bot* in the formula. *See* Laird Decl. ¶1, Ex. A, at ¶ 59.

Documents relating to botulism and protocols applicable to the dry milk powder are likewise relevant to evaluate whether DFA had any knowledge or warning of the potential for *C. bot* in its dry milk powder, performed any tests or analyses on the dry milk powder for *C. bot*, or took other steps that may have increased the risk of introducing *C. bot* into the dry milk powder supplied to ByHeart.

From a public health perspective, urgent testing is critically important for two independent reasons: first, to ascertain the prevalence of *C. bot* spores in the dry milk powder and potential health risks of distribution to other food companies and end-use consumers, and second, to better inform ByHeart, the infant formula industry more broadly, and the FDA, regarding any potential remedial or prophylactic steps that should be considered in addition to the ones ByHeart has already taken to enhance the safety and reliability of this important food supply.

### 2. None of DFA's Objections Is Well-Taken

At the outset, DFA does not have standing to resist ByHeart's demands. It does not own the product, has no interest in the product, and the owner of the product, Organic West, has consented to production subject to agreement on testing protocols—agreement

to which DFA has unreasonably withheld.  *See PlayUp, Inc. v. Mintas*, No. 2:21-cv-02129-GMN-NJK, 2024 WL 472639, at *2 (D. Nev. Feb. 6, 2024) (a party "do[es] not have standing to challenge a subpoena by invoking rights or privileges held by others"); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975).

**Relevance.**  DFA objects that the requests seek non-relevant discovery because some samples are not limited to the specific lot(s) that Plaintiffs' infant consumed.  *See* Laird Decl. ¶ 22, Ex. N.  Not only are these objections unsustainable under the broad relevancy standard, but they defy common sense.  Testing has confirmed that DFA-processed ingredients, which are presumably still being used in food products nationwide, are directly related to the ongoing infant botulism outbreak.

While there may be differences of opinion regarding the weight to give a positive (or negative) test result identified in a sample of DFA-processed dry milk powder that was not used in the formula batch Plaintiffs consumed, that does not make such result irrelevant.  *See Welk Biology Co. v. Hakumo LLC*, 2025 WL 3287591, at *1 & n.3 ("[m]aterial may be discoverable even if not admissible at trial"); *Hernandez v. Cajun Operating Co.*, No. 1:20-CV-00043, 2021 WL 5154782, at *2 (S.D. Tex. Aug. 30, 2021) ("A party may rely on circumstantial evidence to prove a claim that a food product is defective.").  At this early stage, ByHeart does not need to pinpoint the exact lot used to make the ByHeart product allegedly consumed by the infant in this action.

**Undue burden.**  Having established that the requested information is relevant, the burden shifts to DFA to establish why relevant discovery should be denied.  *Painters Joint Comm.*, 2011 WL 4573349, at *5.  To do so, DFA must "specifically detail the reasons" why the requests are objectionable, supported by "specific examples and articulated reasoning."  *PlayUp, Inc.*, 2024 WL 472639, at *2.  In addition to its relevancy objections, DFA raises three categories of objections.  None is valid.

DFA asserts that all of ByHeart's requests are "unduly burdensome," but failed throughout the course of the Parties' multiple meet and confers and correspondence to substantiate any such burden.  *See* Laird Decl. ¶¶ 25-34.  DFA cannot substantiate any cost

burden associated with the samples because ByHeart offered to pick up the requested materials at their current location at the DFA Fallon Plant, in Nevada. *Id.* ¶ 23, Ex. O, at 79-80. DFA cannot substantiate any business concern because Organic West, the owner of the product sought, has consented to producing samples. *See id.* DFA cannot substantiate any supply concern because it has admitted to possessing well over the 1 KG of sample volume ByHeart requested from each of the priority lots ByHeart has identified. *See id.* ¶¶ 25, 30.

Nor has DFA substantiated any burden associated with collecting and producing the two narrow categories of documents ByHeart has requested. DFA has not even attempted to argue that the volume of hits for "botulism" across Company emails are too burdensome to review and produce; indeed, as of the Parties' January 9 meet and confer, DFA had not identified potential custodians, run hit counts, or determined whether or not it had any documents responsive to ByHeart's request apart from selected reports related to SRC testing. *Id.* ¶ 28. Nor has it identified any burden associated with ByHeart's narrow request for policy documents applicable to ByHeart ingredients. *Id.*

**_Duplicative requests._** DFA objects to the subpoena as "duplicative" because the FDA already collected samples and DFA wishes to wait until the FDA's testing is completed before discussing whether it will agree to ByHeart's proposed testing. *Id.* ¶ 14. The FDA's testing does not render ByHeart's proposed tests "duplicative." A request is duplicative if a party "already has the information that they are seeking to obtain." *Photography By Frank Diaz, LLC v. Friends of David Schweikert*, No. CV-22-01170-PHX-JAT, 2023 WL 3078664, at *2 (D. Ariz. Apr. 25, 2023). ByHeart does not already possess the samples or documents it has requested.

Nor are the tests it seeks to perform merely redundant of those being performed by FDA. No single sample can definitively rule out the possibility that a given ingredient contains *C. bot* spores. Increasing the volume and number of samples of ingredient tested enhances the ability to detect whether *C. bot* exists in the ingredient that went into finished product. *See* Mullane Decl. ¶¶ 9-10.

***Other objections.***  DFA objected during meet-and-confer discussions to ByHeart sending samples for testing to independent third-party lab, IEH.  DFA's apparent objection is that IEH has been retained by ByHeart to perform testing and that it does not have prior familiarity with the composition of DFA's products.  Laird Decl. ¶ 26.  To the extent DFA's objection is grounded in bias, it should be rejected.  *See Abbie v. Shasta Cnty.*, No. 2:20-CV-01995-KJM-DMC, 2023 WL 4274135, at *6–7 (E.D. Cal. June 29, 2023) (ordering production of samples over objection to plaintiff's preferred expert, explaining that a "bias argument" is not a basis for denying a motion to compel).

Nor can DFA cite any legal basis for its mere preference to take precedence over IEH's demonstrated capabilities over other alternative labs.  To the best of ByHeart's knowledge, IEH is the only laboratory in the United States currently capable of conducting ISO PCR 17919 testing.  Mullane Decl. ¶ 12.  DFA's preferred lab cannot perform such testing and it has not identified any alternative lab with the same capacity and experience over the course of weeks of meet-and-confers.

ByHeart has addressed DFA's other stated concern to "destructive" testing by obtaining Plaintiffs' consent to the testing.  Laird Decl. ¶ 28.

ByHeart has made every effort to resolve this dispute without seeking the Court's intervention, engaging in no fewer than eight meet and confers with DFA's counsel and significantly narrowing the scope of its requests.  Yet DFA has refused to comply or definitively state the basis for its refusal.  As such, the Court should compel DFA to produce the requested samples immediately, along with documents relating to botulism and DFA's ingredient protocols that will assist in ByHeart's critical and time-sensitive investigation of this infant botulism outbreak.

## IV.   **CONCLUSION**

For the foregoing reasons, ByHeart respectfully requests that the Court order DFA to respond to this Motion within 7 days, ByHeart to file its reply within 5, and that the Court address this Motion on an expedited basis. ByHeart further requests an order compelling

DFA to produce the requested samples and documents within 7 days of the issuance of its order.

DATED:  January 30, 2026                    KNIGHT & RYAN PLLC


                                                 */s/ Robert A. Ryan*
                                            Robert A. Ryan #12084
                                            robert@knightryan.com
                                            Scott A. Knight #9083
                                            scott@knightryan.com
                                            KNIGHT & RYAN
                                            8880 W. Sunset Rd., Suite 130
                                            Las Vegas, Nevada 89148
                                            Tel.: (702) 462-6083

                                            MUNGER, TOLLES & OLSON LLP

                                            Bethany W. Kristovich
                                            *pro hac vice* forthcoming
                                            Daniel B. Levin
                                            *pro hac vice* forthcoming
                                            Juliana M. Yee
                                            *pro hac vice* forthcoming
                                            Jessica O. Laird
                                            *pro hac vice* forthcoming
                                            350 South Grand Avenue, Fiftieth Floor
                                            Los Angeles, California 90071-3426
                                            Tel. (213) 683-9100

                                            Attorneys for Movant, ByHeart, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing **BYHEART'S EMERGENCY MOTION TO COMPEL PRODUCTION OF DRY MILK POWDER SAMPLES FOR TESTING AND DOCUMENTS FROM NON-PARTY DAIRY FARMERS OF AMERICA** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 30th day of January, 2026.

☐ I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☒ I further certify that some of the participants in the case are not registered CM/ECF users. I have served the foregoing document by electronic mail and postal mail to the following participants:

Lauren Colton, Esq.
HOGAN LOVELLS US LLP
Lauren.colton@hoganlovell.com
100 International Dr., Suite 2000
Baltimore, MD 21202
Attorneys for Dairy Farmers of America

Dairy Farmers of America
c/o Corporation Service Company - Lawyers Incorporating Service
2710 Gateway Oaks Drive
Sacramento, CA 95833

*/s/ Jessica Malone*
An employee of Knight & Ryan